* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and argument of the parties. The appealing party has not shown good ground to receive further evidence or rehear the parties or their representatives. Following its review, the Full Commission affirms the Opinion and Award of the Deputy Commissioner, with certain modifications.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. Plaintiff sustained an injury to her left foot by accident arising out of and in the course of her employment on June 10, 2003. *Page 2 
2. Plaintiff's average weekly wage is $300.00, yielding a compensation rate of $200.01.
3. Defendants paid Plaintiff temporary total disability benefits for the period June 11, 2003 through November 23, 2003.
4. Plaintiff is no longer employed by Defendant-Employer.
5. Plaintiff received unemployment benefits for the weeks October 21, 2006 through November 25, 2006.
 * * * * * * * * * * *
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 66 years old. Plaintiff has worked in various jobs off and on since 1972. She was employed as a warehouse worker with Defendant-Employer at the time of her injury.
2. On June 10, 2003, Plaintiff sustained an injury to her left foot at work when a pallet fell on it. Plaintiff was provided with ice to bring down the swelling. She initially declined medical treatment and went home from work as her shift had ended.
3. Later that evening, due to her degree of pain, Plaintiff went to Davis Regional Medical Center where she was diagnosed with a contusion of the left foot and advised to elevate and apply ice to her foot, take medication, and wear a post-operative shoe. Plaintiff was assigned temporary restrictions of no standing for more than thirty minutes, no climbing or working at heights, no kneeling or crawling, and limited bending.
4. Plaintiff received follow-up care at Piedmont HealthCare Occupational Medicine. After Plaintiff's condition did not improve with conservative care, she was referred to an orthopedist for evaluation. *Page 3 
5. On August 6, 2003, Plaintiff presented to Richard W. Adams, M.D., who noted that Plaintiff had experienced continued pain since injuring her foot and had been treated conservatively with a boot and anti-inflammatories. Examination revealed a positive Tinel's sign over the mid portion of the anterior tibial nerve and tenderness over the dorsum of the forefoot out to the base of the second and third toes with some pain into the toes. Dr. Adams diagnosed a "contusion of the dorsum of the foot with contusion damage of the anterior tibial nerve and probable early neuroma formation." Plaintiff received a Celestone injection and was excused from work for two weeks.
6. Plaintiff continued to follow up with Dr. Adams from August through October 2003 with little improvement. She received additional injections, was kept out of work, and instructed to wear a fracture boot.
7. On October 28, 2003, Plaintiff returned to Dr. Adams for a re-examination of her foot. Plaintiff was still experiencing pain over the dorsal aspect of her foot and had cramps up the back of her leg. Dr. Adams believed Plaintiff's symptoms were stemming from the nerve contusion to the anterior foot rather than her back. On November 11, 2003, Plaintiff was allowed to return to light duty office work if she could keep her foot elevated.
8. A Form 28T was filed indicating that Plaintiff returned to work on November 24, 2003. Plaintiff testified that the job she returned to was an office job with Defendant-Employer.
9. On December 2, 2003, Dr. Adams diagnosed a neuroma in Plaintiff's foot. He advised Plaintiff to continue light duty work, massage the area around the neuroma, soak her foot in warm water, take Vitamin B-12, and to continue taking pain medication. *Page 4 
10. On February 3, 2004, Plaintiff returned to Dr. Adams complaining of continuing pain. Dr. Adams administered an injection to the neuroma area, recommended an increased dosage of Neurontin, and continued work restrictions and usage of the cast boot.
11. On February 11, 2004, Plaintiff was examined by W. Hodges Davis, M.D., at the request of Defendant-Carrier. Dr. Davis observed a positive Tinel's on the dorsum of Plaintiff's foot and numbness in the distribution of superficial and deep peroneal nerves, ecchymosis and swelling in the dorsum of Plaintiff's foot, and point tenderness at the second TMT joint. Dr. Davis assessed a left foot crush injury with persistent neuritic symptoms. He recommended physical therapy for scar desensitization and an MRI to make sure there was no ligamentous injury.
12. On March 3, 2004, Dr. Davis noted that physical therapy had helped Plaintiff and allowed her to increase the amount of time she would be able to stand at work. He recommended that she obtain a pair of custom orthotics and continue physical therapy, and anticipated that she might be ready for release in six to seven weeks.
13. Plaintiff returned to Dr. Davis on April 14, 2004. Dr. Davis noted that she had "maxed out her PT," but continued to have symptoms from the crush injury. Dr. Davis felt that once Plaintiff received her orthotics, she would be ready for rating and release to her regular job.
14. On May 5, 2004, Dr. Davis observed that Plaintiff had lost 25 percent of her mid tarsal and subtalar motion, and that she continued to have neurogenic pain consistent with her crush injury. He assigned a 7% permanent partial disability rating to Plaintiff's left foot and recommended permanent restrictions of alternating sitting and standing each hour for a total of four hours standing in an eight-hour day. Dr. Davis also stated that Plaintiff would need to have her shoes and inserts replaced on a yearly basis. *Page 5 
15. On August 25, 2004, Plaintiff returned to Dr. Davis with complaints of intermittent shooting pains from the anterior ankle up to the knee. Plaintiff's symptoms were preventing normal activity. Dr. Davis observed tenderness in Plaintiff's ankle and believed that Plaintiff's soft tissue impingement lesion was contributing to her loss of ankle dorsiflexion. He administered an injection to the front of the ankle and prescribed pain medication.
16. When Dr. Davis saw Plaintiff next on September 15, 2004, Plaintiff reported relief after the injection, but recurrent symptoms of pinching. Dr. Davis felt that Plaintiff's problems were caused by the nerve impingement. He recommended a left ankle arthroscopy and anterolateral decompression of the bony and soft tissue of Plaintiff's left foot, which took place on October 21, 2004. Dr. Davis examined Plaintiff post-operatively on November 1, 2004, and determined that she could undergo physical therapy and return to work at a sit-down job.
17. According to a Form 28 filed by Defendants, following surgery, Plaintiff returned to work on November 18, 2004. Plaintiff testified that she returned to the same office position she had held with Defendant-Employer since November 2003. Plaintiff continued to follow up with Dr. Davis for several months, during which she reported continued pain in her midfoot. Medication and work restrictions were prescribed.
18. On April 4, 2005, Plaintiff returned to Dr. Davis with continued pain in her midfoot, but no significant pain in her ankle. Dr. Davis felt that Plaintiff was close to reaching maximal medical improvement and recommended a functional capacity evaluation.
19. On May 11, 2005, Plaintiff reported to Dr. Davis that she was having problems standing more than 45 minutes at a time. Plaintiff described a jumping pain which Dr. Davis felt was neurological. The functional capacity evaluation revealed that Plaintiff could only perform a sitting job. *Page 6 
20. Dr. Davis assessed Plaintiff as having reached maximum medical improvement on July 8, 2005. He assigned a post-surgical permanent partial disability rating of 17% to Plaintiff's left foot and indicated that she could stand 10 minutes of every hour during an eight-hour work day. He ordered that Plaintiff be provided with shoes and inserts every eight to ten months.
21. On November 9, 2005, Plaintiff returned to Dr. Davis reporting ongoing pain. She was provided with a brace and instructed to return in eight to ten weeks.
22. Plaintiff returned to Dr. Davis on January 9, 2006. She had some continued swelling, but reduced tenderness. Plaintiff's rating and work restrictions remained unchanged and she was released from care.
23. Plaintiff did not present to Dr. Davis again until October 9, 2006, at which time she complained of increasing pain that shot down her foot and up to her hip and back. Dr. Davis observed an antalgic gait and tenderness "over what appears to be almost a mass in the central portion of the ankle with a positive Tinel's to the deep peroneal nerve in that area." Dr. Davis's impression was anterior tarsal tunnel syndrome most likely from a soft tissue impingement lesion. He recommended an MRI and anti-inflammatories.
24. Plaintiff's testimony and Stipulation Nos. 4 and 5 above indicate that Plaintiff was laid off from Defendant-Employer in mid-to late October 2006 and received unemployment compensation through November 25, 2006.
25. Plaintiff was re-examined by Dr. Davis on December 1, 2006. The MRI had not taken place and Plaintiff reported continued left foot and ankle pain, worse in her hip and going down her left leg into the ankle. Dr. Davis renewed his order for an MRI and recommended that Plaintiff be examined by a physiatrist for her back pain and symptoms. Dr. Davis indicated that Plaintiff was disabled from work due to the exacerbation of her symptoms. *Page 7 
26. On January 22, 2007, Dr. Davis noted that there was a question as to whether or not Plaintiff's hip pain was related to her original foot injury. He believed that there was a direct correlation to the work injury because the pain in her hip emanated from her ankle and he felt she had developed anterior tarsal syndrome. Dr. Davis again requested an MRI.
27. On March 30, 2007, Plaintiff was seen by Dr. James Sebold, M.D., for an Independent Medical Evaluation. Plaintiff reported pain radiating from her hip and persistent numbness and tingling in her foot and ankle. Following physical examination, Dr. Sebold's impression was neuropraxic injury to the deep peroneal nerve, status post ankle arthroscopy for an impingement lesion, and posterior hip and leg pain, probably radicular in nature. Dr. Sebold did not feel Plaintiff's hip and leg pain were related to her original injury. He recommended chronic pain management for Plaintiff's neurapraxia, stated that she was at maximum medical improvement, and assigned a 10% permanent partial disability rating of the foot, with permanent work restrictions of no prolonged standing or walking.
28. Plaintiff returned to Dr. Davis on April 23, 2007. Dr. Davis noted that Plaintiff had been examined by Dr. Sebold, who felt that her hip pain had nothing to do with the original crush injury. Dr. Davis continued to believe that Plaintiff's original crush injury had caused an anterior tarsal syndrome and again requested an MRI.
29. The MRI took place on July 24, 2007. On August 15, 2007, Dr. Davis indicated that the MRI showed definitive compression of the ganglion at the navicular cuneiform joint, as well as an osteophyte over the talus over the posterior tibial nerve. Dr. Davis felt that the MRI results were consistent with Plaintiff's symptoms, including her ongoing and significant Tinel's sign. He recommended an anterior tarsal release with excision of the midfoot osteophyte and ganglion. *Page 8 
30. In his deposition testimony, Dr. Davis opined to a reasonable degree of medical certainty that the anterior tarsal tunnel syndrome he had diagnosed in Plaintiff was caused by the June 10, 2003 injury. He explained in detail how the osteophyte and ganglion cyst related to the 2003 injury and would have developed over time, leading to the current nerve compression. Dr. Davis testified that the anterior tarsal release procedure he had recommended was reasonably medically necessary to treat Plaintiff's work-related injury.
31. Dr. Sebold testified that he did not agree with the diagnosis of anterior tarsal syndrome, calling it a "very vague and very sketchy diagnosis." He indicated that he had never diagnosed any patients with that condition or performed surgery for the condition. Dr. Sebold stated that Plaintiff's injury by accident may be contributing to some of her pain, but not all of it. In particular, he stated that he had never seen nerve pain from that area of the foot go all the way to the hip. Instead, he thought the hip pain was coming from her sciatic nerve. Dr. Sebold stated that he had never seen the July 24, 2007 MRI Dr. Davis had ordered.
32. Based on a review of the evidence in its entirety, including the medical records and deposition testimony of Drs. Davis and Sebold, both foot and ankle specialists, the Full Commission assigns greater weight to the opinions of Dr. Davis. Dr. Davis, who treated Plaintiff on multiple occasions from 2004 to 2007 and performed surgery on Plaintiff, is in a better position to provide an opinion and to recommend medical treatment regarding Plaintiff's compensable injury than Dr. Sebold, who only examined Plaintiff on one occasion.
33. The medical records indicate that Plaintiff has not been released by Dr. Davis to return to work since he indicated that she could not work on December 1, 2006. There is no indication in the current dispute that Plaintiff is claiming disability compensation for any period of time prior to December 1, 2006. *Page 9 
34. The Full Commission finds as fact that Plaintiff's current hip, leg, ankle, and foot pain and problems are causally related to her admitted June 10, 2003 foot injury and are, therefore, compensable. Likewise, Plaintiff's current need for medical treatment as recommended by Dr. Davis and her disability from work since December 1, 2006, are causally related to the June 10, 2003 injury.
 * * * * * * * * * * *
Based upon the competent evidence of record, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident while performing her work duties for Defendant-Employer on June 10, 2003, resulting in a left ankle/foot condition as diagnosed by Dr. W. Hodges Davis, Plaintiff's authorized treating physician. N.C. Gen. Stat. § 97-2(6).
2. As a direct and proximate result of Plaintiff's injury by accident on June 10, 2003, Plaintiff has been temporarily totally disabled from December 1, 2006, to the present and continuing and is entitled to receive temporary total disability compensation at the rate of $200.01 per week from December 1, 2006, until further Order of the Commission. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to have Defendants provide all medical treatment related to her June 10, 2003 compensable injury, including the medical treatment recommended by Dr. W. Hodges Davis, Plaintiff's authorized treating physician. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
 * * * * * * * * * * *
Based upon the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission enters the following:
 AWARD *Page 10 
1. Defendants shall pay to Plaintiff temporary total disability compensation at a rate of $200.01 per week from December 1, 2006, until the present and continuing. Accrued compensation shall be paid in a lump sum.
2. A reasonable attorney's fee of twenty-five percent (25%) of the compensation due Plaintiff under paragraph one of this award is approved for Plaintiff's counsel and shall be deducted from the lump sum payment owed Plaintiff and paid directly to Plaintiff's counsel. Thereafter, Defendants shall forward every fourth check to Plaintiff's counsel.
3. Defendants shall pay all medical expenses incurred or to be incurred by Plaintiff as a result of her compensable injuries for as long as such examinations, evaluations, treatments may reasonably be required to effect a cure, provide relief, or tend to lessen the period of disability, when bills for the same have been approved in accordance with the provisions of the Act.
4. Defendants shall pay the costs.
This the ___ day of June 2009.
 S/___________________
 PAMELA T. YOUNG
 CHAIR
CONCURRING:
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1